[No. 3519.]

## WATER SUPPLY AND STORAGE CO. v. LARIMER AND WELD IRRIGATON CO. ET AL.

1. WATER RIGHTS—PRIORITIES—RESERVOIR.

Where reasonable diligence is used in prosecuting the construction of a reservoir, priority to the use of water should date from the time of beginning, and not from the completion, of the work.

2. PRIORITIES—DECREE.

In a proceeding to adjudicate the priorities of right to the use of water, a decree was entered determining the carrying capacity of an enlargement of a ditch without the fact that actual appropriation of water had been made of increased quantity intended to be carried by the enlargement, and providing that if the appropriation intended to be made should in fact be made with due diligence, then the priority of such enlargement should date from the time of beginning work on the enlargement. Afterwards a supplemental decree was entered reciting that the work referred to in the former decree had been completed, and that by reason thereof said ditch was entitled to the priority dating from the time of commencing work on the enlargement. *Held*, that the latter decree supplemented the former, and that the two taken together constituted the decree in the case.

3. CARRYING CAPACITY—RES JUDICATA.

In a proceeding to adjudicate the priorities to use of water for irrigating purposes, the determination by the court of the carrying capacity of a ditch is *res judicata* and cannot be attacked in a collateral proceeding after the statutory time for reformation or review in the court of original jurisdiction has expired and the time for appeal has elapsed. A mistake of the court in computing the carrying capacity cannot be corrected in such proceeding.

4. FILING PLAT—STATUTE.

Sec. 2265, Mills' Ann. Stats., requiring a map showing certain things to be filed within ninety days after the construction or enlargement of any ditch, canal, or feeder for any ditch or reservoir taking water directly from any natural stream for irrigation, applies only to ditches, canals or feeders for reservoirs of the *designated* capacity, taking water *directly* from a natural stream. Ditches, etc., taking water from a natural stream *indirectly* through some previously constructed conduit, or ditches of *other* capacities, or those taking water from an *artificial* stream do not come within the provisions of the statute.

5. HEAD-GATE TAPPING OTHER CANAL—APPROPRIATION FROM NAT-
   URAL STREAM.
The fact that the head-gate of the feeder of a reservoir taps another
    canal and not the stream itself, is not conclusive evidence, if in
    fact it is any evidence, of an intention not to make an appropriation
    of the water of the natural stream. If a company can make ar-
    rangement with the owner of a canal whereby it may put in the
    canal a head-gate and use the canal itself as a conduit for carrying
    the water directly from the stream to such head-gate and thence by
    its own feeder carry the water of the stream to its reservoir for
    storage purposes, that is a matter of contract between the two.
    Such a right might be acquired by condemnation in a proper case
    (Mills' Ann. Stats. sec. 2263, Gen. Stats. sec. 1718) and, of course, by
    contract.

*Appeal from the District Court of Larimer County.*

Mr. H. N. HAYNES, Mr. PLATT ROGERS, and Mr. VICTOR
A. ELLIOTT, for appellant.

Mr. J. W. McCREERY, Mr. C. D. TODD and Messrs. RID-
DELL & STARKWEATHER, for appellees.

MR. JUSTICE CAMPBELL delivered the opinion of the court.

This controversy between the appellant corporation (plain-
tiff below) and appellees (defendants below) The Larimer
and Weld Irrigation Company and The Windsor Reservoir
and Canal Company, consists of two branches. The first
relates to the extent of the priority of the canal owned by
the appellee irrigation company over the ditch owned by
the appellant; the second concerns the seniority of rival res-
ervoir appropriations owned by the appellant and the appel-
lee reservoir company.

The appellant is the owner of the Larimer county ditch
and of reservoirs known as Nos. 1, 2, 3, 4 and 5; the appel-
lee irrigation company of the Larimer and Weld canal and
the appellee reservoir company of the Windsor reservoir.
In proceedings duly instituted under our statutes, framed
for the purpose of establishing the priority of rights to the

use of water for irrigation belonging to the various irrigating ditches and canals throughout the different water districts of the state, to which the then owners of these ditches and canals were parties, a decree was duly entered in the district court of Larimer county on the 11, of April, 1882, adjudicating such priorities in water district No. 3, in which all the ditches and reservoirs in controversy are situate.

It is conceded as a matter of fact, and it so appears from the decree, that the priority of the canal of the appellee irrigation company is superior to that of the ditch of the appellant company; and in so far as the controversy with respect to them is concerned, the contention of appellant is that such priority is only to the extent of 560 cubic feet per second of time, while the position assumed by appellee is that such priority is to the extent of 720 cubic feet per second of time.

All of the reservoirs were constructed subsequent to the decrees mentioned; hence the controversy as to them is not affected by any prior judicial decree, but must be determined entirely from the evidence introduced before the trial court. The avowed object of the action is to obtain a judicial determination of the respective rights of the corporation litigants to divert water from the Cache la Poudre river, both for irrigation and for storage in reservoirs.

The second branch of the case we proceed first to dispose of. The evidence was submitted to the trial court without a jury; and findings of fact made that reservoirs Nos. 2, 3 and 4 of the plaintiff, to a specified capacity, were prior in right to the reservoir of the defendant; and that, as between the plaintiff's reservoirs known as Nos. 1 and 5, or respectively as "Rocky Ridge" and "Long Pond" reservoirs, and that of the defendant reservoir company, the priority was awarded to the latter.

It is practically conceded that the work of construction of the Windsor reservoir (that of the defendant) was begun in July, 1890, and substantially completed in May, 1893. Work upon the Long Pond and the Rocky Ridge reservoirs of the

plaintiff was commenced about the first day of September, 1891 (about one year after the initiation of defendant's enterprise), and was finished before that of the defendant.

The proper solution of the respective rights of the litigating parties with respect to these reservoirs depends very largely upon the fact whether reasonable diligence was used by the defendant in prosecuting work.  It would serve no useful purpose to detail the evidence upon this disputed point, and we content ourselves with the statement that, after a careful examination of the entire evidence, we are satisfied that the finding of the trial court was correct, and that, in the circumstances disclosed by the record, considering the magnitude and cost of the work, and the obstacles put in its way, the defendant reservoir company was diligent in the prosecution of such construction, and that its priority should, by relation, date from the beginning, and not from the completion, of the work.   From this it follows as a matter of law that the priority was properly awarded by the district court to the defendant company as between these three reservoirs in question.

By the decree of 1882 there was awarded to the Larimer and Weld irrigation canal five several priorities, the first by original construction, and the other four by successive enlargements.   The decree, after specifying the several amounts to which the canal was entitled by construction and the first three enlargements, proceeds as follows with respect to the fourth:

" And further, as to said appropriation by fourth enlargement—priority No. 79—in said findings and herein above mentioned, it having been found in manner and form aforesaid that said fourth enlargement of said ditch No. 9 has been, in fact, made, commencing on the month of September, A. D. 1878, by means of which said ditch is actually enlarged to a carrying capacity of 43,200 cubic feet of water per minute of time (i. e., 720 cubic feet per second), the same having been made at great expense and in good faith, for use for said purpose of irrigation, without the fact that actual

appropriation by use of water had been made of increased quantity intended to be carried by means of said fourth enlargement, it is further adjudged and decreed that nothing in said findings or in this decree contained shall prejudice the right of said claimant or other party or parties interested in said ditch or in appropriations of water from said river by means thereof, in or concerning said fourth enlargement, if the said appropriation of water intended to be made thereby has been, or shall be, in fact, made, or any part thereof, with due diligence according to the nature of the work of said enlargement, within a reasonable time from the commencement thereof, and said priority shall stand as No. 79, to cover any such actual appropriation so made or to be made until further order and judgment of this court in that behalf."

From the findings of fact, as well as by the express language of the decree, it will be seen that the fourth enlargement had actually been made at the time the decree was rendered, though the increased supply of water thus secured had not been applied to a recognized use. An opportunity and a right, however, were given to the owner of the canal, or other interested party, within a reasonable time, by proper application, to present proof of, or disprove, the actual application of the enlarged supply of water to a beneficial use, when the original decree would be supplemented and perfected to comply with the facts. Based upon this express order of the court, and in virtue of the irrigation statutes so providing, such application for further proceedings was made, and thereupon an order of the court was entered in March, 1883, for the further hearing of evidence ; and on the 11, of April, 1884, a supplemental decree of the district court was entered, the portions of which that are material to the present discussion are as follows :

" It is * * * decreed that everything in this decree shall be subject to the provisions of the original decree in said matter, as to everything that is and as to everything that is not decided in this decree."

The taking of the additional evidence in this further pro-

ceeding necessitated a renumbering of the priorities, as well as certain changes in other respects. That portion of the supplemental decree affecting the Larimer and Weld Irrigation Company is as follows:

## " No. Nine.

## " Larimer and Weld Irrigation Canal.

" That the work referred to in the original decree, on the completion of which said ditch should be entitled to priority No. 79 in said decree, has been completed, and that, by reason thereof, said ditch is now entitled to priority No. 88 of the new numbering, dating in the month of September, 1878, and that the present dimensions of said ditch are 28 feet in width on the bottom with a berme 5 feet wide on each side so as to carry a flow of 5 feet in depth in all, and so built as to have a section area of 180 feet, with a grade of 2 and 4/10 feet per mile, and that there be allowed to flow in said ditch on all of its priorities so much water as it will carry with the dimensions above given, computed at 720 cubic feet of water per second of time."

The contention of the appellant is that the capacity of the Larimer and Weld canal, as determined by the original decree, was not supported by the evidence, and so far as the decree referred to the last enlargement, when construed in connection with the irrigation statutes, was merely interlocutory and conditional, and left the whole subject of the amount of the appropriation and every matter pertaining thereto, open, unsettled, contingent and uncertain.

It is further claimed that section 2403 of Mills' Annotated Statutes (which is the law governing this matter) does not empower the court to determine the carrying capacity of a ditch or an enlargement, unless an appropriation of the water had then been actually made, and that such ascertainment in the original decree, therefore, is of no effect. It is further contended that the decree of 1882, if the carrying capacity of the canal was properly determined, merged in, and was superseded by, the second decree of 1884. Therefore, it is said,

that after the new decree was entered, the former was of no further force, and by the latter decree the capacity of the canal was erroneously computed; and, as attempted to be fixed, must yield to other data, contained in the decree, establishing the physical dimensions of the canal. It is also urged that the canal has been greatly enlarged since the decrees were rendered.

Upon the other hand, the contention of the appellees is that the two degrees supplement each other, and together constitute the measure of the rights of the parties; and that thereby the defendant irrigation company has a priority over the plaintiff of 720 cubic feet of water per second of time, and that no subsequent enlargements have been made.

Under the theory of the plaintiff, a large volume of evidence was introduced, including all of the evidence that was submitted to the referees prior to the adjudication of 1882 and which was before the district court as the basis for the first decree, and testimony of witnesses first taken upon the trial of the case, for the purpose of showing, among other things, that the original evidence did not warrant so large a quantity of water as the decrees specified; and that a ditch of the physical dimensions described in the decree could not carry 720 cubic feet of water per second of time. Much evidence was directed to the point that by reason of enlargements of the ditch made at various times since the entry of the second decree, the capacity of the canal had so been increased as to permit its owner to obtain more water than originally the canal would carry.

Whatever be the declared object of the appellant in this suit, it is manifest that it can be attained only by treating this action as one for the review of the decrees, in evidence, for mere error of the trial court, long after appellant's statutory time for a review in the district court, and an appeal to this court, has expired;—unless we place upon the decrees the construction which appellant asks. But its contention, in this respect, is altogether untenable.

By its express terms the decree of April, 1884, was in-

tended as merely supplemental to that of April, 1882, and the two, taken together, constitute the decree in the case. By section 2403 of Mills' Statutes, one of the things which the court was required to do was to determine the carrying capacity of the ditch, if the evidence contained sufficient data, not only by original construction, but the increased capacity occasioned by each enlargement. The decree of 1882 expressly . declares that the fourth enlargement had been completed at the date of the decree, and that, by virtue of this enlargement, the entire carrying capacity of the ditch was 720 cubic feet per second of time. But if this fact had not been determined and established by the former decree, the second decree of 1884 confirms the prior findings as well as the former decree, and expressly declares that the capacity of the ditch was computed at 720 cubic feet. So, whether the rights of the parties here depend upon the former, or the latter, decree, or upon both taken as one completed decree, the priority of the Larimer and Weld canal is fixed at 720 cubic feet.

By a somewhat ingenious argument counsel for appellant insist that the ascertainment of the carrying capacity of this ditch, as expressed in the decree, is not *res judicata*, and is of less dignity and importance than is the determined physical dimensions; and that it must yield to such other ascertainment of superior rank concerning physical dimensions. It is said to be a mere matter of computation from these other data, and that, under the latest approved formula for ascertaining the carrying capacity of water in ditches and canals, the computation, as originally made by the court, was erroneous, and that the specified quantity should be much less.

It must be remembered that the present action is not for the purpose of reforming the decree upon the ground of mistake or fraud, or any other recognized ground, but that it is in the nature of a collateral attack upon the decrees after the statutory time for their reformation or review in the court of original jurisdiction, upon the same or additional

testimony, has long gone by, and when the right of appeal is also lost by lapse of time. The present action cannot be allowed to usurp the function of an appeal or writ of error, and thus secure a correction or reformation of the decree, because of some erroneous calculation of the district court. If a mistake was made by the court in computing the capacity of the ditch, such a mistake cannot be corrected in this proceeding. The capacity is *res judicata*, as much as is any other fact which the special statute requires the court to determine. *New Mercer D. Co. v. Armstrong*, 21 Colo. 357.

But if we should adopt appellant's views and hold that, under these decrees, the carrying capacity of the canal was still open to adjudication, and that the court, in the present action, might determine the same, the evidence before us would not, at this late period, justify the reduction asked. From the testimony of Prof. Carpenter it would appear that the latest approved and most trustworthy test for ascertaining the carrying capacity of streams and canals is that known as Ganguillet and Kutter's. By the application of their formula, a ditch of the theoretical dimensions specified in the decree will not, so Prof. Carpenter testifies, carry more than about 560 cubic feet of water per second of time; at least, his computation so resulted. It is in evidence, however, that in accordance with a formula that was in general use in this state at the time the decrees were rendered, the computation, as determined by the decree, was substantially correct, and it further appears that no two computations are ever the same, even with the same formula. Hydraulics is said to be one of the most complex of sciences. Under the title hydromechanics, at p. 494, vol. 12, of the Encyclopedia Britannica, as well as from Prof. Carpenter's testimony, it seems that in the formula used by the latter in estimating the capacity of the canal, $n$ represents the coefficient of roughness. Without going into this technical and scientific subject at any length, it is sufficient merely to say that the mathematical value of this element varies with different conditions from .010 to .035. The formula is confessedly em-

pirical and not strictly scientific; it has not been adopted by our statutes or by the courts as a rule of evidence, or as the exclusive test for ascertaining the carrying capacity of ditches.

The testimony upon this point is in substantial conflict; so, also, is there a substantial conflict in the testimony as to the enlargement of this canal after the two decrees were rendered, and as to the amount of water which the canal at various times since its construction has actually carried. In accordance with some of the testimony, it appears that, as a matter of fact, the ditch has at different times carried even more than the amount of water for which the decree was rendered. There is no serious contention by appellant that there has been any abandonment by appellee company of any of the waters which the decrees have awarded it; but if the point was urged, we would unhesitatingly affirm the finding of the trial court that proof of abandonment was not made out.

Such being our ruling upon the priorities of the reservoirs, and such being our construction of the decrees in this case, and holding, as did the trial court, that they determine the priorities attaching to the canal and the ditch, and that they award to the canal of the defendant irrigation company a priority of 720 cubic feet of water per second of time ahead of any priority belonging to the ditch of the plaintiff company, and it also appearing that if the entire question were reopened at the instance of the plaintiff, there is not in the record sufficient evidence to justify a reduction of this quantity, it follows that the decree should be affirmed in all respects as entered by the district court.

*Affirmed.*

### UPON REHEARING.

MR. JUSTICE CAMPBELL delivered the opinion of the court.

A rehearing upon both branches of this case has been allowed. Additional counsel have favored us with elaborate

written and oral arguments.    While the former arguments upon the main propositions have been cast in new settings, and in some respects urged with greater vehemence and more superlatives,—with the exception of an attempt by appellant to change position in some particulars,—neither side has presented any questions that were not thoroughly argued and considered at the original hearing.

One of appellant's new counsel opens his brief with the following statement: "It is the belief of many members of the profession that an application for rehearing cannot succeed unless the error of the court is suggested in terms of such modest contention as to amount almost to an apology and with plausible avenues of retreat, should the error be made apparent.    With that belief we do not agree, nor are we disposed to adopt the method of argument which it requires."

Our experience, based upon an examination of many such applications, would not lead us to suspect that such belief was widespread, or had effected permanent lodgment in the minds of many of the profession.    Certainly, in the case at bar, while counsel has observed that respect for the court which is fitting, he has, in his argument, left no room for doubt as to his own notion of the method of argument to pursue, and if that argument is given the weight which it is assumed to possess, there is left for the court no avenue of graceful retreat.

*First*, as to the ditch and canal priorities: Complaint is made because, in the opinion, we treated this action as in the nature of a collateral attack upon the ditch decrees. Counsel now say its object was to correct the decree in question on the ground of a mistake of the court in computing the quantity of water appropriated by the owner of the Larimer and Weld canal.

That we were justified in our characterization is apparent from the complaint itself; but, if we were mistaken in this respect, counsel for appellant fell into the same error, for in his original brief he says that "the complaint was a bill in

equity, in the nature of a bill of peace * * * and, particularly, to obtain judicial determination of the respective rights of the corporation litigants to divert water from the Cache la Poudre river, both for direct irrigation, and for storage in reservoirs."

Since the proceedings in question were instituted and prosecuted to obtain, and the decrees thereunder resulted in, a judicial determination of the same rights which the plaintiff seeks here to readjudicate, we said then, and now say, that this is a collateral attack.    The appellant, after once stating what the object of his action was, should not complain if we adopt his own definition.    But if a party should be permitted thus to shift his position, and if we were to assume with him that the complaint pleads a mistake as the equitable cause of action, we proceed to an examination of the record upon that hypothesis.

Among the findings of the district court were the physical dimensions of the canal and the quantity of water appropriated.    Counsel say that by the latest and most approved test a canal of such ascertained dimensions is incapable of carrying such computed capacity.

In *Ditch Co. v. Ditch Co.*, 22 Colo. 115, it was ruled that in a decree, like that under consideration, one of the things to be embodied therein is the quantity of water; hence, when once ascertained, it is *res judicata*.    Counsel now seize upon this declaration and say that the physical dimensions of the ditch are likewise to be determined; and taking these dimensions as one verity, we have, it is said, in the same decree two verities absolutely inconsistent with each other. Both cannot be true; one must be false; which shall be upheld, which rejected?    Having propounded this query to us, counsel proceed to answer it for themselves by rejecting the computed quantity as of less dignity, because, they say, it is the result merely of a mathematical calculation based upon an absolute and fixed verity, viz : physical dimensions.

We observe, first, that the statute requires the court in its decree to set forth the quantity of water appropriated,

describing such amount in cubic feet per second of time, if the evidence shall show sufficient data to ascertain the same. If, however, such data are not in the evidence, then, in lieu of the quantity, the decree must set forth the width, depth and grade of the ditch, *and such other description as will most certainly and conveniently show said amount.* If sufficient data are at hand, as they were in this case, physical dimensions are not required. In this there is the implication that physical dimensions alone are not sufficient data from which to ascertain the quantity; other description, other data enter into the problem. This decree contains both the quantity in cubic feet and physical dimensions; and it might be argued that the contingency under which the court might ascertain dimensions not having happened, the ascertainment of the latter was unauthorized, and that only the quantity ascertained was a judicial verity. At least, it would seem, counsel have not correctly stated the proposition, and the premises laid down in the foregoing argument are not strictly correct, and their reasoning not conclusive. But interesting as may be the question which, if either, of these two alleged verities is of the higher rank, the requirements of this case do not call for its resolution. Involved in appellant's argument is the assumption that, if we use this new test, the calculation as made by the district court is erroneous. In the formula commonly designated as Kutter's the value of "$n$," the coefficient of roughness, which is one of the most important factors, varies under different conditions. Where the ditch is smooth, with no obstructions in it, with but few and well rounded curves, with banks and bottom hard and well packed, it has one value; where its surface is rough, covered with grass, weeds or other obstacles that naturally accumulate in the use of the ditch, with numerous and sharp curves, this value is different. The alleged proof of the erroneous calculation is found in the testimony of Prof. Carpenter that from two measurements or experiments made by him, he so determined. But, as stated in the original opinion, we think it clear from his testimony and that of other wit-

nesses as to this point, and from what the authorities say of the value and accuracy of this formula that thereunder substantially the same result might be reached as that arrived at by the trial court under another formula. At any rate, it is not made clearly to appear by this record that a different result would necessarily follow if this new formula should be used.

However this may be, it is altogether sufficient for the purposes of this case to say that, when this decree was entered, the computation of the court was made under a test, or formula, then in general use in this state and, as the evidence tends to show, recognized as the most accurate then employed; and that said computation upon that basis is correct.

This is by no means a case where the decree on its face shows that a formal or clerical error as to calculation was committed. The claim is not that the court erred in making the computation from the formula which it used, but, on the contrary, the mistake complained of consists in the use of a wrong formula, and in not selecting the one which, as is said, has since been discovered and found to be more accurate. It seems clear, however, where the issues are framed with that object in view, that such a mistake cannot be corrected. If so, it would permit a court, not upon a review in appellate proceedings, but in a direct proceeding, to overturn a decree because, upon further consideration, and in the light of new evidence, the court thought a different conclusion should have been reached. If we should now correct the decree of 1882 for the reason urged, then at the end of the next decade there may be evolved a new method of determining the carrying capacity of ditches giving even more accurate results than under the Kutter formula, and in an action then brought to correct the mistake made by us now in applying the Kutter test, the court must set aside our decree and enter a new one, and so there would be no end to the litigation, provided new and more accurate tests are discovered. *Union M. & M. Co. v. Dang-*

*berg*, 81 Fed. Rep. 73, 116, is an instructive case upon this point, and is squarely against appellant.

We conclude the discussion of this branch of the case by remarking that counsel's entire attack upon this decree is an attempt, only partly disguised, under the pretense of correcting a mistake therein, at this late day to reopen and readjudicate the relative rights of ditch owners whose predecessors in interest were parties to the proceedings in which the decree determining these rights was rendered; and therein consists the fundamental error in much of their argument. This attempt is the more clearly apparent when we find that, with much apparent earnestness, they aver that it is of common knowledge that these early decrees,—entered when lawyer and layman were in doubt as to the meaning of the recently enacted law, and when knowledge of irrigation was limited,—awarded to the ditches a greater quantity of water than they were entitled to, or could carry. That since that time many of the statutory obscurities have been elucidated by legislative amendment and judicial decision, and the science of irrigation has greatly developed. That among the discoveries made is the fact that the carrying capacity of ditches can now be more accurately determined than formerly. In view of these considerations, counsel ask us arbitrarily, as we think, to correct these early mistakes; —their client and its grantors not having availed themselves of the relief which could be awarded under the statute had a review been seasonably asked, or an appeal taken.

As an illustration that courts avail themselves of the latest developments of science, we are admonished that the science of operating a railroad is of constant growth and expansion, and that in actions sounding in damages for personal injuries, involving the correlative duties of master and servant, the court constantly takes notice of these advances, and so modifies and expands old rules to conform to new processes and to meet new conditions. So we are asked in the decision of this controversy, in determining whether the district court erred in computing the capacity of the Lari-

mer and Weld canal, to apply to that question a test or formula that is said to have come into general use since the district court had occasion to determine what was a proper test.

The illustration from railroading was unfortunate for the appellant, for, as is well said by counsel for appellee, while courts do avail themselves of new processes and new discoveries in all branches of science and apply them to new cases as they arise, they do not, in a direct proceeding, open up solemn judgments, rendered upon competent and proper testimony, for the purpose of setting aside a calculation or a deduction therein made by the trial court, based upon ligitimate testimony, and substitute therefor a different conclusion merely because subsequent discoveries in some science or art would seem to require it. In a new case upon the same facts, or in the former case had such later facts then been in evidence, the question is entirely different. So, here, this ditch decree cannot be reopened to correct an alleged mistake made in the calculation of the quantity of water appropriated, based upon a formula which the evidence then established to be the most correct in general use, because, as the result of later investigations, another test has been discovered, said to give more accurate results. And if this Kutter formula was then known and not used by the court, we must presume that it was the finding and judgment of the court that the one that was used was more accurate. In either case the decree cannot be disturbed.

In passing upon the reservoir rights, the appellant complains that this court in its opinion, as well as the district court in its findings, entirely ignored the decree of the district court of Larimer county of March, 1885, in which, it is claimed, there was decreed to the appellant's various reservoirs certain priorities of the same date as that awarded to its canal. In this great injustice is said to have been done.

It is true that the opinion states that the reservoirs in question were unaffected by any decrees of the court, as the reservoirs were built after the decrees were rendered.

Though the decree of 1885 was ignored as a material question in the case, it was by no means overlooked. That decree, in one clause, purports to award certain priorities to the reservoirs of appellant, which, taking that one portion by itself, apparently makes them superior to that of the defendant reservoir company. That we had abundant reason for our statement will now be shown from the record, even though the effect be to prolong the opinion.

In his original brief filed in this court the counsel of appellant, who also tried this case in the district court, in summarizing his argument on the reservoir priorities concludes with this statement:

" In the foregoing deductions from the evidence, we have said nothing concerning the decree of 1885, adjudicating that the Larimer county ditch (appellant's grantor) had a right to use its priority, dating from 1881, to fill Long Pond ; nor have we referred to the fact that water had been stored, to some extent, in Long Pond during the '80s, by appellant's grantor. *We do not need to rely on any claims based on the decree of 1885, or any exercise of rights under that decree by the old company.* We do call attention to the point, however, that if a non-use of any excess over 560 cubic feet per second, by the Larimer and Weld Irrigation Company, for irrigating purposes, from April 11, 1884, to June 20, 1893,— a period of nine years,—did not constitute an abandonment of any pretended rights, based on a computation in the decree of 1884, then a failure to beneficially use water stored in Long Pond, between October 30, 1885, and May, 1892,—a period of only six and a half years,—did not constitute an abandonment of any rights."

The zeal of counsel to claim under this decree, and thus shift the former position, is born since our original opinion was handed down ; for as we therein held in favor of the defendant reservoir company, under the evidence upon the issue of diligence in construction, they now seek to escape the effect of that holding by claiming under a prior decree.

But if the appellant's own concession in argument, as

above quoted, does not work an estoppel to allege the contrary, the record itself otherwise furnishes most ample authority for disregarding the decree.   Its complaint, by which, of course, appellant is bound, does not predicate any rights upon this decree, but only upon the fact that appropriations of water for its reservoirs were perfected prior to the inception of defendant's rights.   Turning to the evidence, we find that no pretense is made that the reservoirs were completed, or appropriations of water therefor perfected, prior to 1892.   A sworn statement was filed October 10, 1892, by the appellant company under section 2265, Mills' Ann. Stats. (Gen. Stats. sec. 1720) wherein is not only no claim of priority for any of the reservoirs under any decree, or any reference thereto, but the priority of all is claimed, by way of relation only to the date when the work of construction was begun in the month of September, 1891.

Referring again to the proceedings terminating in the decree of 1885, there is no finding of fact by the court, or recital in its decree, that these reservoirs at the time were completed, or that water had ever been stored therein. Upon the contrary, it is clear from the entire record in the case that neither in the decree of 1885, nor in the preliminary or conditional decree entered in 1882, was there ever any intention to award any priority to the reservoirs of appellant, unless completed within a reasonable time.   These decrees must be taken together, and every part thereof must be considered.   By section 6 of the decree of 1882 (which decree, by express recital to that effect in the decree of 1885, is made part of the latter), pleaded by appellant itself, it is expressly declared that its provisions should not apply to any ditches, canals, or reservoirs completed after the closing of the testimony in that proceeding; and it was further provided that the decree should apply only to such as were finished before the decree itself was entered.   So we conclude that the decree of 1885, taken in connection with that of 1882 as should be done, rightly interpreted, did not award, and did not purport to award, to these reserviors any priority prior

to their appropriation of water and their completion within a reasonable time, and then by relation to date as of the beginning of the work of construction. If, however, it did, other facts in this record show that the reservoirs themselves were never completed until some time in the year 1893; that practically they were not used for storage purposes until that time. These facts, coupled with the sworn statement filed in October, 1892, by their owner that work was begun on them in September, 1891, and the priority claimed only from that date,—constitute, as pleaded by the defendants, virtually an abandonment by appellant of any alleged priority secured by the decree by expressly making the inception of its right date when work began, long after the decree was entered.

The record also shows beyond any serious controversy that the chief, if not the only, issue at the time of the trial as to these reservoirs was as to the diligence employed by the defendant reservoir company in completing its work. Counsel on both sides thus tried the case, and the evidence was directed almost exclusively to that issue; and the parties should be held to the case as thus made.

Appellant, however, for the purposes of the argument, conceding our statement to be true, further contends that, under the evidence produced at the trial upon this issue, the findings of the court below were wrong, and should be set aside. Courts do not lay down a general rule by which, in every case, due diligence may be determined; but it is a question of fact depending largely upon the facts and circumstances of the particular case. To attempt to give a general definition would be unwise, and we do not deem it necessary to this case, or helpful as a precedent, to give in detail the facts in this record. We content ourselves by saying that, after a very careful rereading of the evidence, we are satisfied that the defendant reservoir company observed due diligence in completing its work, and that the findings of the trial court to that effect are sustained by the evidence.

What to us, however, is the most plausible argument made

in support of the appellant's contention that its reservoir priorities are superior is this: Since the appellant finished its reservoirs before the defendant reservoir company completed its work, although said latter company first began the work of construction, the priority of the defendant may not, by relation, take effect as of said beginning, because the defendant failed to file its map and statement, as provided by section 2265 Mills' Ann. Stats., until after the appellant had made its filing, entirely finished its work and perfected its appropriation. The statute is as follows:

"Every person, association or corporation hereafter constructing or enlarging any ditch, canal or feeder for any ditch or reservoir for irrigation and taking water directly from any natural stream, and of a carrying capacity of more than one cubic foot of water per second of time, as so constructed or enlarged, shall, within ninety days after the commencement of such construction or enlargement, file in the office of the county clerk and recorder of the county in which the headgate of such ditch or feeder may be situated, and also in the office of the state hydraulic engineer, a map, etc., showing certain things. * * * If such statement be filed within the time above limited, priority of right of way, and water accordingly, shall date from the day named as the day of commencing work, otherwise, only from the date of the filing of the same."

The appellee contends, *inter alia*, that this statute is inapplicable to the case in hand; yet, if so, that for various reasons it is unconstitutional.

We appreciate the difficulty and importance of the questions raised as to the constitutionality, the meaning and effect of this act; and in a proper case would not hesitate to determine them. But in the view we take of this case, the constitutional question is not properly before us. A careful reading of the act shows that the intention of the general assembly was to make its provisions apply only to ditches, canals or feeders for reservoirs of the designated capacity, taking water *directly* from a natural stream. Ditches, etc.,

taking water from a natural stream *indirectly* through some previously constructed conduit, or ditches of other capacities, or those taking water from an artificial stream, fall without its provisions.

Now the feeder for the reservoir begun by the defendant reservoir company in 1890 was not intended to, and does not, take water *directly* from the Cache la Poudre river, or any natural stream, but its head-gate is in the previously constructed Larimer and Weld canal at a point therein situate in Weld county. The head-gate of the canal itself is in Larimer county. These facts are conceded by the appellant when, in answer to a contention that the defendant's filing of the map in Weld county was a compliance with the act for the reason that the head-gate of its feeder in the canal was in Weld county, its counsel replied thereto by saying that the canal is an artificial, and not a natural, stream. Indeed, it may well be said that, if this act is applicable, the defendant complied therewith, for it filed its map and statement in that county in which the head-gate of its feeder was situate. But we say that the defendant's feeder did not take water *directly* from a natural stream; and the act being penal in character, its scope should not be extended to include feeders or ditches that are not, by reasonable construction, within its provisions.

If, however, it be said that defendant, by attempting to file its map thereunder, recognized the applicability of the act to its enterprise, it can scarcely be seriously argued in one breath that the priority of the defendant is lost by reason of the failure to comply with a certain act, and in the next breath to say that an unsuccessful attempt to comply with its provisions estops the party to deny its applicability. But even if defendant company had made full compliance with this act by filing its map, and even though counsel on both sides concurred in holding it applicable to the defendant's ditch, this would not bind the court to follow their opinion on a question of statutory construction.

But it is said further that the defendant reservoir com-

pany has made no appropriation of water for reservoir purposes from the natural stream, and intended to take none, but, on the contrary, appropriated, and intended to appropriate, only the excess of water in the Larimer and Weld canal when not required by its owners for direct irrigation. This is said to appear both from the pleadings and the evidence. The defendant's answer avers directly to the contrary, and distinctly alleges a claim of, and an intention to claim, an appropriation both of such excess and an original appropriation of water from the stream itself, and the evidence clearly warrants the findings of the trial court to that effect.

The fact that the head-gate of the feeder of the reservoir tapped the Larimer and Weld canal, and not the stream itself, is by no means conclusive evidence, even if, in fact, it is any evidence, of an intention not to make an appropriation of the water of the natural stream. The canal is not owned by the defendant reservoir company, yet if the latter is able to make an arrangement with the owner thereof, whereby it may put in the canal a head-gate and use the canal itself as a conduit for carrying water directly from the stream to said head-gate, and thence, by its own feeder, carry the water of the stream to its reservoir for storage purposes, that is a matter of contract between the two. Such a right might be acquired by condemnation in a proper case (Mills' Ann. Stats. sec. 2263; Gen. Stats. sec. 1718), and, of course, by contract. We perceive no reason why a distinct and valid appropriation of water from the natural stream, either for direct irrigation or for storage in a reservoir, may not thus be made. Indeed, section 2265 itself, if valid, when it makes applicable its provisions only to ditches, etc., of a certain carrying capacity, and to those taking water *directly* from a natural stream, tacitly, and by implication, recognizes that a valid and original appropriation of water from a natural stream itself may be made by and through ditches of other carrying capacities, and by those taking water *indirectly* therefrom. The feeder constructed by the defendant not

being of the class specified in the act, is unaffected by its provisions. It was not necessary, therefore, for defendant to file a map and statement.

Many other propositions have been discussed, but we do not consider them material to this decision. The foregoing sufficiently disposes of the questions necessary to be determined. The former opinion is adhered to.